FAGAN ELECTRIC COMPANY *v*. GREEN.

5-1412                                   308 S. W. 2d 810

Opinion delivered January 13, 1958.

*S. Hubert Mayes,* for appellant.

*Lookadoo, Gooch & Lookadoo,* for appellee.

CARLETON HARRIS, Chief Justice. Roy L. Green, in the course of his employment with the Fagan Electric Company, received, on December 22, 1950, a compensa-

ble injury. He was thereafter paid temporary total disability for a healing period of 55 weeks at $25.00 per week. At the conclusion of the healing period, it was determined that Green had a 20 per cent permanent partial disability to the body as a whole. This represented 90 weeks of compensation at $25.00 per week. This was paid to Green, and on September 28, 1953, when the last payment of $25.00 was tendered to him, he was requested to sign Form A-11 (which is a required form of receipt by the Commission). Green refused to sign, it being his contention that he was entitled to a greater percentage of disability. The case thereafter was heard by one of the referees, and an opinion was rendered on September 19, 1955, in which the referee held there was no greater residual attributable to the accident of December 22, 1950, than the 20 per cent admitted by appellant. A timely appeal was taken by Green to the full Commission. Thereafter, on May 15, 1956, the Commission rendered its opinion, in which it sustained the original opinion of the referee, and denied any additional claims for compensation. Whereupon Green appealed to the Circuit Court of Hot Spring County. On April 2, 1957, the said Circuit Court rendered a judgment reversing the Workmen's Compensation Commission, and directed that an award be entered compensating Green for permanent and total disability. From such judgment appellant brings this appeal.

Green's injuries, occasioned by a tree falling on him, were rather severe, and included a fractured spine, a brain concussion, and a fractured wrist. Three operations were performed on the wrist alone, and he was hospitalized off and on for about a year, last hospitalization occurring in May of 1951, at which time there was an operation on his right arm. In August, 1952, he commenced work for the Arkadelphia Sand and Gravel Company[1] (where he had previously been employed before working for Fagan Electric Company). His duties consisted of driving a locomotive engine[2] from the plant

[1] Works eight or nine hours a day during the week at an hourly wage of 80¢.

[2] A Plymouth automobile with the wheels changed.

to the river, a distance of about a half mile each way, hauling gravel. Fred Wells, superintendent, stated this was light work, and he would not put Green on heavy work. He stated that Green was a willing and satisfactory worker, but somewhat irregular. In his words: "Just roughly, I'd say he would come down, maybe work this week, maybe next week lose two or three days of that week — just in and out that way." In Wells' opinion, Green's condition was growing worse. Green's testimony as to his condition, briefly summarized, is as follows: It was approximately two years after the accident before he attempted to work at all. . . it is necessary that he stay busy, otherwise, he is like something "caged up"; . . . he is extremely nervous, and suffers constantly except when "my head and neck all goes to sleep" . . . his head hurts all the time, and he is unable to sleep . . . he has to take sedatives . . . he has "black out" spells . . . when his head would hurt, he would "go wild" and chew his tongue . . . that he now becomes irritated and angry easily; "Anytime anybody messes with me, I am mad, my wife, or anything else. If I go out to the porch, at times I have gone home from work, something or other, if a dog rears at me, it makes me mad, kill him right then. Whenever I get that way something hits me. Everything goes out. Maybe I have forgotten about the dog. Looks like a thousand lights hits my head." He further testified that when he is not busy, he worries; that he will not travel by himself, and that the condition referred to came about after the accident; that prior thereto, he was entirely able bodied. Green's wife corroborated much of this testimony.

Green's medical evidence consisted of reports by Dr. F. Walter Carruthers of Little Rock, Dr. Frank Padberg of Little Rock, Dr. R. L. Bryant of Arkadelphia, and Dr. Joe Winston Reid of Arkadelphia. At the request of the Commission, Green was examined by Oschner's Clinic in New Orleans, and the report of Dr. Homer Kirgis is favorable to Green. The reports are rather extensive, and can only be briefly summarized here. Dr. Carruthers'

report of October 16, 1953, sets out that Green is mentally disturbed, and

"* * * In all probabilities he had a fracture involving the base of his skull. * * * — these episodes of black outs, his angry spells, the chewing of his tongue all point to cerebral irritation. Certainly he has a mild form of the Jacksonian type of epilepsy. This is an epilepsy due to a physical condition following injuries to the brain. * * * I feel that his major aftermath complaints can be based entirely upon the craniocerebral injury that he has rather than upon his general physical conditions that I have mentioned as being normal. In other words, the other fractures and injuries that he received apparently have healed, and he has recovered from those. On the other hand, his mental and physical debilities as the results of the head injury, certainly he has not recovered from that . * * *"

The report concludes by stating that it is his opinion that the general overall body disability amounts to a minimum of 30 to 35 per cent. Dr. Padberg's findings, dated October 8, 1953, are based entirely on the patient's history. He found Green to be "quite anxious," and stated that he appeared to have some disturbance with recollection of dates. From the report:

"* * * His history of black out attacks accompanied by sphincteric disturbance as well as tongue biting episodes certainly sounds like he may have had some sort of major cerebral irritation to produce these attacks. * * *"

Dr. Bryant found:

"* * * My diagnosis from examinations and x-rays and treatment at the time was that this man was suffering from post-traumatic headaches; extreme nervousness; poor muscular coordination, as he was very unstable on his feet. He would be expected to have these post-traumatic headaches, with possibly a change in his personality, and to become

emotionally unstable as a result of the injuries he received. Prognosis: I have not seen Mr. Green since February 18, 1952, and at that time my prognosis was 'unfavorable.' * * *''

Dr. Reid saw Green regularly over a period of five or six years, and submitted several reports. It was his opinion that Green's symptoms and attacks were the results of the injuries received in 1950. On November 9, 1955, Dr. Reid stated:

''* * * He is not able to work and in my opinion will not become any better. I believe his disability to be the end result of injuries received in 1950. I believe he will continue to become progressively worse. * * *''

Dr. Kirgis, in a report of October 9, 1954, stated:

''* * * This patient, undoubtedly, sustained a severe cerebral contusion and the present symptoms represent a residual of that injury. The extent to which the brain was damaged could be evaluated more satisfactorily if an electroencephalogram and a pneumo-encephalogram were made. In view of the occurrence of the 'blacking out spells', I think it is important that these tests be made. I doubt, however, that he will ever be able to perform work which requires any significant exertion or responsibility. * * *''

On December 23, a further report was mailed to the Commission by Dr. Kirgis, which concludes by stating:

''* * * The electro-encephalographic and the pneumo-encephalographic findings suggest that this patient has permanent organic damage to the brain. This, of course, was suggested by the clinical picture. I do not think his condition will change much from the present level. * * *''

The medical evidence on the part of appellant consisted of the reports of Dr. Fred Harris of Little Rock Dr. H. M. Nixon of Little Rock, Dr. Joe F. Shuffield of Little Rock, and Dr. Robert Watson of Little Rock. Dr.

Harris' report, dated July 26, 1952, concluded by finding:

" * * * It is my opinion from the standpoint of the traumatic injuries, that healing was completed by December, 1951, or one year following his accident. This may be too liberal in time element. At present, it would be desirable to state definitely whether the head symptoms are the result of the injury to the brain or are the result of hypertension. I cannot definitely draw a conclusion here, because the present symptoms could all be explained on the basis of hypertension. Since high blood pressure is the result of pathological changes, it is my opinion that the existing hypertension is the result of pathological changes and not caused by his accident. In considering the permanent partial disability of the body as a whole, it is my opinion that it will not exceed 12 to 15 per cent, and this again may be liberal. * * *"

Dr. Nixon's report, dated January 25, 1952, concluded:

" * * * It is my opinion that Mr. Green's healing period has ended, and from a bone or joint standpoint, I see no reason to further examine or treat him. From a bone and joint standpoint, it is my opinion that he has a permanent disability of 25 per cent of the body as a whole. * * *"

The report of Dr. Shuffield, dated July 10, 1952, finds:

" * * * It is quite evident that the fractures that he had in his spine, which have been previously reported, have now healed solidly with very little deformity, * * * So far as this man's disability resulting from his injury is concerned, apparently, it is not great. Certainly it could not exceed 20 per cent to the body as a whole. * * *"

Dr. Watson made several examinations of Green over a period of time, concluding such examinations on January 31, 1955, as reflected by his report of February 9, 1955.

"\* \* \* This man has been working for the Arkadelphia Sand and Gravel Company for the past two years. In substance, he has many generalized complaints referable to his body. He states he feels 'give out all over'. Also he describes smothering spells, and tells me he has a hurting sensation over his heart. When questioned pertaining to his neck and shoulder they 'give him lots of trouble'. Also he tells me his left kidney 'hurts' a lot and that he has rheumatism in his bones and joints.

On examination this man gets around in active agile fashion. He bends well in undressing, but later, when it is obvious that such movements are coming under the direct observation of the examiner, these movements of his back are then quite limited. \* \* \*

Throughout the whole of the neurological examination this man continued to complain unceasingly in respect to some part of his body, first one part and then the other. \* \* \*

All along this man has had a disturbingly high blood pressure and even back in 1951, a diagnosis of hypertensive heart disease with aortic insufficiency was made. His blood pressure has always been too high, particularly his diastolic reading. On many occasions back in 1950, reading such as 180/120, 190/110, 170/120, 210/120, and even at the time of this present examination, the man's blood pressure was 200/130.

In evaluating this man, one must draw definite distinction between those symptoms which are residuals from his injury and those symptoms which are due to the progressively increasing high blood pressure this man possesses.

Back in 1952, in July, it was concluded that these complaints referable to headache, feeling of fullness in the head, impaired hearing on the left, and whatever complaints of backache he might possess, were logical and acceptable and very likely the result of

the trauma he experienced in 1950, and for that reason he was given an estimate of 20 per cent permanent residual disability affecting the body as a whole. On the other hand, these complaints of 'black out spells, crazy drunk spells in the head', and other such subjective complaints are definitely a picture so frequently seen in situations of hypertension with associated cerebral vascular involvements.

In comparing his present picture with that back in 1952, one cannot demonstrate any basis for now increasing his estimate of residual disability that would be based on actual progression of disability due to his earlier trauma. Whatever progression he now has is a part of his advancing picture of cerebral arteriosis and a generalized increase in his picture of hypertension."

It might be pointed out also that the report from Dr. Kirgis showed Green's blood pressure 200/120. Dr. Reid concurred in a report dated August 9, 1955, by saying, "His blood pressure continues to range from high normal to an extremely high pressure." The Commission found that "* * * claimant herein, by reason of the compensable accidental injury sustained December 22, 1950, suffers residual permanent partial disability of 20 per cent to the body as a whole. * * *" This finding was largely based upon the statements of Dr. Watson. The Commission said:

"* * * we believe the statements of Dr. Robert Watson, a neurosurgeon who examined claimant shortly after his injury and on several other occasions thereafter, resolves any doubt which might be created by other medical evidence. Dr. Watson attributes claimant's present disability in excess of 20 per cent to the body as a whole to hypertension resulting from pathological changes not associated with claimant's injury. The same pathological changes are described in the reports of other competent medical authority. * * *"

The only question before this Court is whether there was substantial evidence to support the finding of the Commission. As was said in *Hughes* v. *Tapley, Administratrix*, 206 Ark. 739, 177 S. W. 2d 429:

"* * * The rule is well established, under the Workmen's Compensation Act that 'Findings of fact made by the Workmen's Compensation Commission are, on appeal, given the same verity as attach to the verdict of a jury', and this applies on appeal to the Circuit Court as well as to the Supreme Court from the Circuit Court. * * *"

In the same case it was also said:

"* * * The rule is also well settled that in testing the sufficiency of the evidence before the Commission, the Circuit Court, on appeal from the Commission, and this Court, on appeal from the Circuit Court, must weigh the testimony in its strongest light, in favor of the Commission's findings. * * *"

Both holdings have been reiterated numerous times, and such is recognized as well settled law in this state. Appellee points out that Dr. Watson was the only one of appellant's witnesses to examine Green after September 28, 1953, while examinations by appellee's medical witnesses were made subsequent to that time. This fact, of course, merely goes to the weight of the evidence, and was due to be considered, along with all other circumstances, in reaching conclusions. As far as we know, this fact was considered. Obviously, appellee made rather a strong case, but though we had the inclination to do so, we are completely without authority to overturn the ruling of the Commission if there is substantial evidence to sustain same.

Here, the evidence was rather conflicting, but clearly both sides presented evidence of a substantial nature. Such evidence included (from both sides) statements of doctors who are widely recognized. It was simply a matter of which evidence proved more persuasive to the Commission. For this Court to hold con-

trary to the findings of the Commission, would be merely to substitute our judgment for theirs. We are not a jury, and as stated in *H. C. Price Construction Company* v. *Southern,* 216 Ark. 113, 224 S. W. 2d 358: "* * * It is immaterial that we might reach a different conclusion if permitted to try the case anew. * * *".

Accordingly, the judgment of the Hot Spring Circuit Court is reversed, and the cause is remanded with directions to enter judgment affirming the findings of the Commission.